OPINION
{¶ 1} Appellant, Gregory Marin, appeals from a judgment of the Geauga County Court of Common Pleas, granting summary judgment to appellees, Jon W. Frick ("Jon"), and his daughter, Kathryn Frick ("Katie"). For the reasons set forth below, we affirm the trial court's judgment on appellant's claim for strict liability.
 {¶ 2} Appellant and Katie were never romantically involved and were good friends since approximately 1990.
 {¶ 3} Appellant had a high school education. At the time of the incident, in July 1999, he worked as a waiter at a local restaurant. Since June 6, 2000, he had worked as a construction worker for Perk, and he was a member of the Local 860, based in Cleveland, Ohio. Appellant testified, "I lay pipe. I build bridges. I jackhammer. I shovel. I rake concrete. I finish concrete." Katie had a bachelor's degree in political science from the University of Toledo, and she worked as a client relations manager at an advertising and marketing firm based in Dayton, Ohio.
 {¶ 4} Jon and his wife obtained a chocolate labrador retriever named Chocolate Chip ("Chip") when they were in Florida in approximately February 1999. In July 1999, at the time of the incident, Chip was approximately one year old and weighed between sixty and eighty pounds.
 {¶ 5} Katie and Jon each testified that appellant had always been welcome in their home and had spent a lot of time there. On July 14, 1999, Katie's parents were in Canada at a car show. After completing his shift as a waiter, appellant visited Katie at her home and arrived sometime between 12:00 a.m. and 12:30 a.m. Appellant testified at his deposition that Chip was excited when he arrived.
 {¶ 6} Katie was also deposed, and she stated that appellant had a few drinks, and she asked him to stay overnight in her brother's room rather than driving home.[1] Appellant denied drinking that night.
 {¶ 7} Shortly thereafter, Katie decided to take Chip outside for a walk. Katie put a leash on the dog. Appellant and Katie walked outside together, with Katie walking Chip on a leash. According to appellant, Chip was "hyper" at this time.
 {¶ 8} Katie testified that the telephone rang, and she asked if appellant would hold the dog while she went inside the house to answer it. Appellant did not testify about a telephone but instead stated that Katie asked if he would hold the dog while she went inside to use the restroom. Regardless, appellant agreed, and he took control of Chip's leash. Katie testified that she went inside, answered the telephone, and spent maybe a minute and a half on the telephone. Then she used the restroom and returned outside.
 {¶ 9} According to appellant, he began walking the dog on the leash when something caught Chip's attention, causing him to run in circles and pull away from appellant. Appellant stated, "* * * as I was walking the dog, he was hyper. He was circling me and, you know, bouncing around. As I got to the driveway, he saw something and he hit me in the leg. And as I fell down, I caught myself with my elbow, to try to stop or break my fall. And I let go of the leash, and the dog took off down towards the driveway and into the woods towards the neighbor's house." He testified his left elbow and knee contacted the ground, but he did not lose consciousness. Appellant did not know what Chip allegedly chased.
 {¶ 10} When Katie returned outside, she did not initially see appellant. She testified, "I walked around the corner of the house, and [appellant] was along the side of the house * * *. He was standing on the blacktop area, and he was holding his arm. And I said, where is Chip, what happened. And he said, oh, my elbow, oh, I fell. I really messed up my elbow. I fell on my elbow and I really hurt my elbow. * * * [Appellant] explained to me that he had gotten Chip to play with him by running back and forth from the left to the right, along the side of the back side of the home, which is grass. * * * And so he played with him, running back and forth, and his words were, we got tripped up and he fell and landed on his elbow and broke his fall with his elbow, and then obviously broke his elbow."
 {¶ 11} Katie then called Chip and he walked up and greeted her.
 {¶ 12} Appellant was not bleeding, but he testified that he told Katie he was going to pass out. Katie took appellant to Hillcrest Hospital's ("Hillcrest") emergency room at about 1:30 a.m. Katie testified that, as they waited for appellant to be seen in the emergency room, appellant was not given pain pills right away because he was intoxicated. Appellant's arm was X-rayed, and appellant was given a sling. Katie and appellant left the hospital at approximately 4:00 a.m., and Katie testified appellant was given a pain pill at that time.
 {¶ 13} Appellant testified he had surgery the following week, and a pin and some wires were put in his elbow. No medical evidence was admitted from this surgery or his experience in the Hillcrest emergency room.
 {¶ 14} Appellant testified at his deposition that, in February 2002, the pain in his arm was to the point where he could not perform at his construction job anymore. Appellant stated, "[i]t hurt so bad when I would get home from work, it would get stuck in the `L' position, and I couldn't extend it after a day's work." Thus, appellant left the union and began working for Land Design Consultants.
 {¶ 15} According to appellant, he went to see Dr. Paul at the Zeeba Ambulatory Center in June 2002. Appellant stated he thought Dr. Paul removed a pin and some wires from his elbow. According to appellant, at a follow-up visit with Dr. Paul, he told Dr. Paul that his arm seemed okay. Again, appellant offered no medical evidence.
 {¶ 16} Appellant testified that he was off of work from February 2002 to September 2002, but he also stated that he was able to go back to his construction work at Perk in September 2002. No evidence was admitted verifying this.
 {¶ 17} Jon testified that he agreed to pay for appellant's medical expenses, via his homeowner's insurance, if appellant would sign a statement that he would not sue Jon and/or Katie. Katie testified that appellant never signed such a statement, and, therefore, her father never contacted the insurance company to request payment of appellant's expenses.
 {¶ 18} Katie and Jon both testified that Chip was a very mellow dog who would not play without some extreme encouragement. For example, Jon testified,
 {¶ 19} "Q: * * * Have you ever known him to growl, snarl, or snap at anyone?
 {¶ 20} "A: That would take energy wouldn't it?"
 {¶ 21} Both Katie and Jon testified, separately, that the family had almost renamed Chip Forrest Gump because he was so unresponsive. Jon stated, "[w]ell, I am telling you, the dog was Forrest Gump reincarnated. This dog was the most cooperative animal." He further stated that Chip did not play much and that "[h]e was just a lover. * * * I never heard anyone refer to that dog in a negative way. He wasn't a jumper, he wasn't a pusher, he wasn't one of those dogs that comes up and leans on you. He was just Forrest Gump. We really considered re-naming him."
 {¶ 22} Chip now resides with a woman in her 80s who lives in Parkman, Ohio. Appellees were unable to remember the woman's name, and the dog was not located.
 {¶ 23} Katie testified that her mother got rid of Chip because he was too dirty for the white carpet in their Florida home. Katie stated that "[m]om and dad had that new house in Florida, and mostly white colored carpet, and [Chip] is a brown dog, and they live near the river, and she didn't want a brown dog that she had his brown hair on her white carpet [sic]."
 {¶ 24} Jon testified similarly. He stated, "[w]hen this dog shook, I don't know what you know about Labs, but Labs are constant shedders. They shed hair like you have got a hair cut every day. And down here [in Florida], we didn't come down here to clean the house every day. We came down here to enjoy things and relax. And this dog stood in front of the window one day and shook, and a cloud fell off of him, and my wife said that's it. We have got to get rid of this dog. I can't take all of this hair."
 {¶ 25} Appellant and Katie remained friends for some time after the incident, and Katie testified that appellant took her and her fiancé out to celebrate their engagement. Appellant and Katie stopped talking when appellees were notified that appellant filed suit against them.
 {¶ 26} Appellant's complaint was filed on September 9, 2002, and appellant brought causes of action under strict liability and negligence. Appellant prayed for damages in excess of $25,000 for injuries, pain and suffering, and lost wages. Appellees answered and denied that Chip caused appellant to fall.
 {¶ 27} Appellant submitted a pretrial statement listing his medical expenses. The statement included: $682 from Lakeland Emergency (Hillcrest) from July 14, 1999; $82 from Hillcrest radiology from July 14, 1999; $3,030 from Dr. Edwin A. Hissa from July 14, 1999 to July 29, 1999; $85 from Northeast Ohio Group Practice from July 20, 1999; $3,295.25 from Lake Hospital from July 21, 1999; $540 from Anesthesia Associates from July 21, 1999; $145 from Downtown Therapy from September 29, 1999; and $4,640 from Zeeba Ambulatory Center from June 11, 2002 to August 26, 2002. Appellant never submitted any medical records or invoices verifying his injuries or his medical expenses.
 {¶ 28} On May 1, 2003, appellees moved for summary judgment and asserted that no genuine issue of material fact existed under either appellant's theory of strict liability or his theory of negligence. Appellant replied. The trial court granted appellant's motion as to both causes of action on September 9, 2003.
 {¶ 29} From this judgment, appellant now appeals only from the trial court's grant of summary judgment to appellees on his claim of strict liability. Appellant asserts the following assignment of error:
 {¶ 30} "[1.] The trial court committed reversible error by finding that appellant was a "`keeper' of the dog at the time the injuries were sustained, and therefore was not entitled to relief afforded under Ohio Revised Section 955.28."
 {¶ 31} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio EdisonCo., 77 Ohio St.3d 102, 105, 1996-Ohio-336. Pursuant to Civ.R. 56, summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can reach only one conclusion, which is adverse to the party against whom the motion is made, such party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C);Mootispaw v. Eckstein, 76 Ohio St.3d 383, 385, 1996-Ohio-389;Leibreich v. A.J. Refrigeration, Inc., 67 Ohio St.3d 266, 268,1993-Ohio-12; Bostic v. Connor (1988), 37 Ohio St.3d 144, 146.
 {¶ 32} Material facts are those facts that might affect the outcome of the suit under the governing law of the case. Turnerv. Turner, 67 Ohio St.3d 337, 340, 1993-Ohio-176, citingAnderson v. Liberty Lobby, Inc. (1986), 477 U.S. 242, 248. To determine what constitutes a genuine issue, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Turner at 340.
 {¶ 33} A party seeking summary judgment on the grounds that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim. Dresher v. Burt,75 Ohio St.3d 280, 1996-Ohio-107. Accordingly, the moving party must specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim. Id. If the moving party satisfies its initial burden under Civ.R. 56(C), the nonmoving party has the reciprocal burden to respond, by affidavit or as otherwise provided in the rule, so as to demonstrate that there is a genuine issue of fact. Id. However, if the nonmoving party fails to do so, then the trial court may enter summary judgment against that party. Id.
 {¶ 34} In appellant's sole assignment of error, he argues that the trial court erred by granting summary judgment to appellees on his claim for strict liability. Specifically, appellant contends that he was not a "keeper" within the confines of R.C. 955.28 and that he is entitled to recover under R.C.955.28 for his injuries. We disagree.
 {¶ 35} R.C. 955.28 provides:
 {¶ 36} "(B) The owner, keeper, or harborer of a dog is liable in damages for any injury, death, or loss to person or property that is caused by the dog, unless the injury, death, or loss was caused to the person or property of an individual who, at the time was committing or attempting to commit a trespass or other criminal offense on the property of the owner, keeper, or harborer, or was committing or attempting to commit a criminal offense against any person, or was teasing, tormenting, or abusing the dog on the owner's, keeper's or harborer's property."
 {¶ 37} R.C. 955.28 itself does not define the terms owner, keeper, or harborer. However, case law is enlightening. "`[A]n owner is the person to whom a dog belongs, while a keeper has physical control over the dog.'" Khamis v. Everson (1993),88 Ohio App.3d 220, 226, quoting Flint v. Holbrook (1992),80 Ohio App.3d 21, 25. See, also, Garrard v. McComas (1982),5 Ohio App.3d 179, 182, (A keeper is one having physical control of a dog.). Likewise, "`a harborer is one who has possession andcontrol of the premises where the dog lives, and silently acquiesces to the dog's presence.'" (Emphasis sic.) Khamis at 226, quoting Flint at 25.
 {¶ 38} It is well-settled that an owner or keeper of a dog is not protected by R.C. 955.28 and cannot sue an owner or keeper to recover for injuries proximately caused by the dog. "[B]y enacting R.C. 955.28(B), the legislature intended to protect those people who are not in a position to control the dog. In contrast, * * * the legislature did not intend to protect those persons (the owner, keeper or harborer of the dog) who have, by the terms of the statute, an absolute duty to control the animal." (Emphasis sic.) Khamis at 227. Accordingly, "`* * * the clear meaning of R.C. 955.28 is that either an owner or a keeper of a dog [including a dog watcher] shall be liable for injuries proximately caused by that dog, including injuries sustained by that owner or keeper. To adopt [a contrary interpretation] would give the statute force beyond its plain terms * * * and would result in a strained and unreasonable interpretation of the statute.'" Id. at 224-225, quoting Myersv. Lynn (July 19, 1985), 6th Dist. No. L-85-009, 1985 Ohio App. LEXIS 6966. See, also, Johnson v. Allonas (1996),116 Ohio App.3d 549.
 {¶ 39} Accordingly, the issue in the instant matter is whether there existed genuine issues of material fact as to whether appellant was Chip's keeper at the time of appellant's injuries. Our review of the relevant law reveals that there existed no genuine issues of material fact, and appellant was Chip's keeper at the time of appellant's injuries. Accordingly, summary judgment in favor of appellees was proper on appellant's claim for strict liability under R.C. 955.28.
 {¶ 40} A dog watcher is a keeper of a dog within the meaning of R.C. 955.28. Johnson at 450; Khamis at 224. In Johnson,
the parties were friends, and the plaintiff knew the dog. The plaintiff took it upon herself to put the dog on a leash and walk the dog outside to relieve himself. "While standing near the edge of the driveway, an unrestrained neighborhood cocker spaniel approached [the dog] and growled. [The dog] stepped up to meet the [cocker spaniel], but on [plaintiff's] command the dog returned to her. The plaintiff became entangled in the dog's leash, fell, and was injured." Id. at 448. The court found that a dog watcher is clearly a keeper of a dog within the clear meaning of R.C. 955.28. Id. at 450.
 {¶ 41} Appellant argues that this court took a position inManda v. Stratton (Apr. 30, 1999), 11th Dist. No. 98-T-0018, 1999 Ohio App. LEXIS 2018, opposite the position outlined inJohnson. Appellant contends that in Manda we held that whether a person is a keeper within the meaning of R.C. 955.28 is always a question of fact to be submitted to a jury. We disagree.
 {¶ 42} In Manda, the dog bite occurred behind closed doors of an X-ray room in a veterinarian's office. The dog bit the veterinarian's assistant, and the assistant and her husband sued the dog's owner for her injuries. At the time of the bite, only the veterinarian and the assistant were present in the X-ray room, and the owner was in the waiting room. Id. at 1-3. The trial court concluded that neither the veterinarian nor his assistant could be a keeper of the dog, stating that:
 {¶ 43} "`The veterinarian had no right to do anything to the dog other than what was consented to by [the owner]. [The owner was] in an adjoining room and at any point in time could have retaken control of the dog and left the premises.'" Id. at 8.
 {¶ 44} The trial court granted summary judgment to the plaintiff on her claim for strict liability pursuant to R.C.955.28.
 {¶ 45} We reversed. We concluded that "* * * the focus should be on the status of the person bitten by the dog rather than the time frame in which the physical control was exercised." Id. at 10. Thus, we stated "* * * whether or not the veterinarian and his assistant could be considered `keepers' of the dog in thecase at bar is a question of fact for the trier of fact." (Emphasis added.) Id. at 10. We therefore concluded that summary judgment in favor of the plaintiff veterinarian assistant was improper in that instance.
 {¶ 46} Appellant argues the same conclusion should be applied in this case, and appellant essentially contends that whether a plaintiff is a keeper should in all instances be a question of fact for a jury. Again, we disagree.
 {¶ 47} It is clear from the language used in Manda that the court's holding was limited to the facts of that case. The court held that "[w]hether or not the veterinarian and his assistant could be considered `keepers' of the dog in the case at bar is a question of fact for the trier of fact." Manda at 11. TheManda court decided nothing more than that, and the court's holding fell far short of concluding that whether an individual is a dog's keeper is always a question of fact for a jury. As theManda court properly noted, each dog bite case is distinguishable on its facts, but summary judgment may indeed be appropriate in some cases. Id. at 1-3. The holding in Manda
does not prevent this court from determining as a matter of law whether an individual fits the definition of a keeper of a dog.
 {¶ 48} Turning to the instant matter, we note that a keeper is one charged with the responsibility of controlling the dog under his care. Johnson at 451. While there is no ironclad definition of keeper and each case is distinguishable, in the instant matter there existed no genuine issue of material fact that appellant was Chip's keeper at the time of the incident.
 {¶ 49} Katie asked, and appellant agreed to take Chip's leash and watch him while Katie went inside the house. It is apparent that appellant was charged with the responsibility and care of Chip during this brief time. Appellant's limited interaction with Chip prior to the incident, or the fact that he was only in charge of Chip for a few minutes, in no way diminished his position in control of Chip or his duty to control Chip at the time of appellant's injury. "It is clear that the focus was on the status of the person [injured] by the dog rather than the time frame in which the physical control should be exercised. * * * [T]he time period during which control is exercised over the dog is irrelevant." Manda at 10-11. A dog watcher is a keeper of a dog. See, e.g., Johnson at 450; Khamis at 224. It is thus apparent that appellant was Chip's keeper at the time he sustained his injuries. Under those facts, which are not in dispute, the dispute as to whether appellant was also teasing the dog is not a material dispute.
 {¶ 50} Accordingly, there existed no genuine issue of material fact that appellant was the dog's keeper at the time of the incident. Thus, appellant is barred from recovering from appelles pursuant to R.C. 955.28. Appellees were entitled to judgment as a matter of law on appellant's claim under R.C.955.28 for strict liability. Appellant's sole assignment of error is without merit, and we hereby affirm the judgment of the trial court.
O'Neill, J., concurs in judgment only, Grendell, J., concurs in judgment only.
[1] Katie testified that appellant frequently stayed over at night and even lived with her and her parents for a while when she and appellant were in high school because appellant was having problems in his home.